UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBERT W. BURTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:04-cv-1941-DFH-TAB |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Robert W. Burton seeks judicial review of a final decision by the Commissioner of Social Security denying his application for disability insurance benefits.  Acting for the Commissioner, Administrative Law Judge ("ALJ") Paul R. Armstrong determined that Mr. Burton was not disabled under the Social Security Act because he retained the residual functional capacity to perform a significant range of sedentary work.  Mr. Burton challenges the ALJ's finding, asserting that the ALJ erred by discounting the opinion of his treating psychiatrist and Mr. Burton's own testimony about the extent of his pain and other symptoms.  As explained below, the ALJ sufficiently explained his decision, which is supported by substantial evidence.  His decision is therefore affirmed.

*Background*

Mr. Burton was 33 years old in 2004 when the ALJ found him ineligible for disability insurance benefits.  Mr. Burton had completed two years of college and

had previously worked as a home health aide and a loan officer.  R. 17, 228, 58, 271.  Mr. Burton claimed to suffer from diabetes, polyneuropathy, degenerative disc disease with a pars defect, sleep apnea, and anxiety, among other conditions.  See R. 17, 54, 55, 59, 61-62, 68.  After the hearing, Mr. Burton submitted a medical report stating that he had schizoaffective disorder.  R. 174.  Mr. Burton claimed that these impairments disabled him within the meaning of the Social Security Act after April 1, 2002.  R. 16.

Mr. Burton sought treatment from Dennis F. Lawton, M.D., in 2001 for symptoms of his diabetes and for anxiety.  R. 360-61.  Dr. Lawton prescribed Paxil for Mr. Burton's anxiety.  *Id.*  In January 2002, Mr. Burton again sought treatment from Dr. Lawton complaining of pain in his neck and legs.  R. 359, 366.  Dr. Lawton prescribed medication to alleviate the pain.  R. 359.  Mr. Burton reported that the Paxil kept his panic disorder under control, but he continued to complain of pain and sought additional medication.  R. 356-59.  A January 2002 report from Jose D. Panszi, M.D., stated an impression of Mr. Burton's condition as "mild motor sensory peripheral polyneuropathy."  R. 346.  Dr. Lawton's notes from April 2002 state that though Mr. Burton experienced no clinical changes and had no knee effusion or ankle swelling, he reported increased pain.  Dr. Lawton prescribed additional medication.  R. 356.  Although Mr. Burton had tried multiple medications to alleviate his pain during this period, Dr. Lawton's notes indicate that the medications either caused side effects or were ineffective.  *Id.*  Dr. Lawton's notes state that Mr. Burton had been unable to work since April 28,

2002.  R. 355.  Mr. Burton saw Dr. Lawton again in July for pain in his lower back.  R. 343.

In July 2002, Mr. Burton also sought treatment from Jason Mara, M.D., reporting that he experienced pain in his arms, legs, hands, back, and neck, as well as numbness in his feet.  R. 349.  Mr. Burton also claimed that he had not found anything that alleviated the pain, which he described as sometimes dull and constant and sometimes stabbing and sharp.  Mr. Burton reported to Dr. Mara that he had "good and bad days" based on his pain level and was bedridden on his bad days.  *Id.*  Dr. Mara observed that Mr. Burton was slow to rise from a seated position but exhibited normal gait and station.  Dr. Mara noted that Mr. Burton could stand and walk on heels and toes, tandem walk, complete a full squat, and showed no effusion or inflammation.  With the exception of a forward flexion of the dorsolumbar spine of 78 degrees, Mr. Burton exhibited a normal range of motion.  R. 350.  Dr. Mara's neurologic exam of Mr. Burton showed motor strength of 4+/5 in his arms and legs, normal muscle tone and strength, normal deep tendon reflexes, an intact sensory system, and normal fine finger skills.  *Id.*

On August 5, 2002, Mr. Burton saw psychologist Ceola Berry, Ph.D., for a consultative mental status examination.  R. 270.  Mr. Burton told Dr. Berry that he had been diagnosed with neuropathy and had once been hospitalized years earlier for "paranoia, depression, being shy, and suicidal ideation."  *Id.*  Mr. Burton reported taking Paxil, Lotensin, Glucotrol, Gemfibrazol, and Trental, and

using Duragesic patches.  *Id.*  Mr. Burton reported that he was able to dress, bathe, groom himself, and do his own cooking, cleaning, and laundry.  R. 271. He also reported that he was unable to sit, stand, walk, or attend to simple repetitive tasks continuously for a two hour period as a result of complications with his neuropathy.  Mr. Burton reported that he had not worked since April 2002 because of his neuropathy.  *Id.*  He reported that he was seeking disability benefits because of his pain, poor balance, frequent falls, numbness in his feet, panic attacks, and "extreme fear of people."  R. 272.  Dr. Berry also noted that Mr. Burton "denied delusions, hallucinations, obsessive-compulsive preoccupation, and homicidal and suicidal ideation."  *Id.*  Dr. Berry diagnosed Mr. Burton with an Axis I "Mood Disorder Due to Medical Condition of Diabetic Neuropathy with Generalized Anxiety and Panic Features" and assigned him a Global Assessment of Function ("GAF") score of 74 on the scale to 100.  *Id.*

A state interviewer conducted an interview with Mr. Burton's friend and reference, Harold Martz, in October 2002.  Mr. Martz reported that he spoke to Mr. Burton daily and had known him for thirteen years.  He also reported that Mr. Burton was not seeking treatment from any psychologist, psychiatrist, counselor, or therapist.  Mr. Martz reported witnessing Mr. Burton have panic attacks but said that his condition appeared to have improved after his Paxil dosage was increased.  He visited Mr. Burton in his home frequently and said that Mr. Burton did a good job keeping his small apartment clean.  He also reported that Mr. Burton fell frequently but did not use any assistive devices.  R. 223-25.

-4-

J. Pressner, Ph.D., reviewed Mr. Burton's records and completed a psychiatric review technique form stating that Mr. Burton did not have severe mental impairments.  R. 255.  Dr. Pressner stated that Mr. Burton appeared "partially credible" and that reports of his functioning indicated he did not have severe limitations due to a mental impairment.  R. 267.

Mr. Burton continued to seek treatment from Dr. Lawton in January 2003 and received prescriptions for Duragesic pain patches and Lortab.  R. 116.  Mr. Burton also complained of the symptoms of restless leg syndrome.  R. 115.  In February 2003, Mr. Burton complained of leg cramps and increased anxiety.  Dr. Lawton increased his dosage of Paxil in April 2003.  R. 108, 110.  Mr. Burton reported in late April 2003 that his pain medication was not working, but also complained that he felt he was taking too many medications.  Dr. Lawton reduced the dosages on some of Mr. Burton's prescriptions.  R. 107, 108.

Mr. Burton also sought treatment by Vivek Agarwal, M.D., for an injury to his right shoulder in a car accident in March 2003.  R. 135-36.  He returned for an additional evaluation and for treatment in April 2003.  Dr. Agarwal's notes state that Mr. Burton continued to experience pain in his shoulder, only some of which was relieved by an injection.  Dr. Agarwal referred Mr. Burton for an MRI on his shoulder and to Robert Lillo, M.D., for evaluation of his cervical spine and his right arm.  R. 126-33.  Dr. Lillo's report showed an impression of "spondylolisthesis secondary to pars defect at L5."  R. 124.  Dr. Lillo's assessment

showed no "clear cut evidence of neurological compromise" of Mr. Burton's spine and no "clear cut" depressive lesion.  Dr. Lillo suggested a pars block and perhaps additional injections to relieve pain.  R. 125.

In May 2003, Mr. Burton returned to Dr. Lillo for a follow-up examination. Mr. Burton reported that the pars block and the epidural injections were not effective to relieve his pain.  Dr. Lillo noted that Mr. Burton's MRI showed some mild disc protrusions but no evidence of any neurological compromise.  Dr. Lillo recommended physical therapy.  He noted that Mr. Burton's pain was "unresponsive with conservative measures."  R. 119.  He wrote that Mr. Burton would be referred to a surgeon "to see if he has anything to offer [Mr. Burton]." *Id.*  Dr. Lillo wrote:  "I don't know that there is much else to do otherwise." *Id.*

Mr. Burton then saw Jeffrey Heavilon, M.D., for an orthopedic surgery consultation.  Dr. Heavilon noted that Mr. Burton reported pain in his lower back that sometimes radiated into the buttocks and thighs.  Dr. Heavilon described Mr. Burton as a "cooperative gentleman in no major distress" at the time of his examination.  R. 117.  Dr. Heavilon's examination of Mr. Burton showed no cutaneous abnormalities in his back.  He noted some tenderness to pinching and an indentation in the lumbosacral junction, but wrote that this was "not very dramatic." *Id.*  He noted no tenderness to percussion in the midline of the mid lumbar or thoracic areas, but noted "a little bit of discomfort to percussion in the mid cervical spine." *Id.*  Mr. Burton was able to walk on toes and heels, and a

musculoskeletal examination of his legs showed "good motion to the hips, knees, and ankles." R. 118. Dr. Heavilon wrote that no operative procedure would be likely to improve Mr. Burton's symptoms. He recommended that Mr. Burton continue current courses of treatment, keep as active as possible, and control his weight. He recommended that Mr. Burton discontinue smoking because it had "been associated with back problems." *Id.* Dr. Heavlion also recommended a functional capacity evaluation to "more scientifically" assess Mr. Burton's "ability to do work." *Id.*

Dr. Lillo reported that Mr. Burton received an epidural injection in August 2003 that provided some pain relief. R. 140. Mr. Burton also returned to Dr. Agarwal in August 2003 complaining of shoulder pain. R. 139.

In July 2003, Mr. Burton saw Barbara Umberger, Ph.D., at the Briarwood Clinic for mental health services. Mr. Burton complained of increased anxiety and fear resulting from the March 2003 car accident. R. 159. After rescheduling some appointments, Mr. Burton began seeing Rebecca Licht, LMHC, at the Briarwood Clinic on December 17, 2003. R. 158, 166. Ms. Licht referred Mr. Burton to Brian Bertsch, M.D., a psychiatrist. R. 156. On January 13, 2004, Ms. Licht wrote to Dr. Bertsch that Mr. Burton complained of hearing the voices of deceased family members and was deeply depressed and anxious. *Id.*

In February 2004, Ms. Licht completed a mental residual functional capacity assessment using Mr. Burton's self reports.  Ms. Licht's assessment stated that Mr. Burton reported hearing voices "on and off most of the time," and that the voices often spoke about death.  R. 166.  She wrote that Mr. Burton reported having depression and difficulty concentrating as a result of the voices, which impaired his ability to meet "the most basic requirements of self care."  R. 166-67.  She also stated that Mr. Burton reported experiencing high levels of anxiety.  R. 166-73.

Mr. Burton testified at his hearing before the ALJ in February 2004.  When the ALJ asked about his shoulder, Mr. Burton testified that "they took care of that."  R. 55.  He testified that he had pain in his lower back that bothered him "the majority of the time" that was sometimes relieved by injections.  *Id.*  He also testified that he experienced nausea as a side effect of the Duragesic pain patches and that his psychiatric medicines made him a "space cadet," but he claimed that he had only just started the psychiatric medicine.  He testified that he was smoking a pack of cigarettes per day and that his knee was recovering well from a recent operation.  Mr. Burton testified that he did not want to take part in vocational rehabilitation because of his pain and the side effects of his medications.  He testified that he was nervous and had sought mental health treatment.  R. 55-62.  Mr. Burton also testified that he had been working full-time as a home health aide in 2002, but that he had left the position because his pain kept him from performing necessary tasks and interfered with his attendance.  R.

62-65.  Mr. Burton testified that others completed household tasks for him, and that on some days his pain, "mental problems," and medications kept him from getting out of bed.  R. 67.

When the ALJ asked about Mr. Burton's "schizophrenia," Mr. Burton reported that he "had problems with it for years."  R. 61-62.  Mr. Burton's attorney claimed that Mr. Burton was seeing a psychologist named Barbara Coon, and Mr. Burton testified that he was receiving treatment from Ms. Licht.  R. 68.  Mr. Burton testified that he experienced anxiety and heard voices, but that the medications he had recently been prescribed were reducing these problems.  R. 69.  He testified that such problems had persisted since his youth and were exacerbated or triggered by traumatic events, such as the deaths of family members.  When the ALJ asked why Mr. Burton was able to work during such periods, Mr. Burton testified that he tried to hide these experiences.  R. 70-73.  The ALJ also questioned testimony from Mr. Burton's brother that Mr. Burton had experienced fear of social situations during the same period that he was apparently excelling in his employment as a health aide.  R. 76.  Mr. Burton testified that he would sometimes report that he was having problems with his back when in fact he was experiencing problems with his "nerves" in order to hide his mental impairments.  R. 77.

Mr. Burton testified that the unpredictability of his symptoms made it difficult for him to work.  He also testified that he sometimes had to lie down for

hours when experiencing back pain and that he experienced frequent headaches that required him to lie down and take a nap.  R. 81, 84.

Dr. Richard Hutson, a medical expert, testified at the hearing that Mr. Burton had a pars defect and degenerative disc disease.  R. 85-88.  Dr. Hutson also noted that there was some indication of peripheral neuropathy.  R. 89-90. Dr. Hutson recommended that Mr. Burton be limited to sedentary work with a sit/stand option, restrictions of no overhead reaching with his right arm, and no repeated twisting, trunk vibration, or bending beyond 45 degrees.  R. 89-90.

Gail Ditmore, a vocational expert, also testified at the hearing.  Ms. Ditmore doubted that an individual with the characteristics listed by Dr. Hutson could continue as either a home health aide or a loan officer, but opined that such an individual could nonetheless work as an assembler, inspector, or sorter.  Ms. Ditmore testified that the same person would not have such opportunities if he needed to lie down for a couple of hours each day or if he missed more than two days of work per month.  R. 96-98.

Dr. Bertsch completed a mental impairment questionnaire on March 2, 2004.  Dr. Bertsch reported that he saw Mr. Burton for an initial assessment in January 2004 and a follow-up assessment in February 2004.  R. 174.  He reported that Mr. Burton had an Axis I diagnosis of Schizoaffective Disorder and Generalized Anxiety Disorder.  He evaluated Mr. Burton's GAF at 65.  *Id.*

Dr. Bertsch stated that Mr. Burton experienced poor memory; disturbances in perception, sleep, concentration, and mood; emotional lability; decreased energy; persistent irrational fears; generalized persistent anxiety; oddities of thought; social isolation; blunt, flat, or inappropriate affect; delusions or hallucinations; anhedonia; psychomotor agitation; and paranoia. *Id.* He opined that Mr. Burton's impairments would likely cause him to be absent from work more than three times each month. R. 176. He reported that Mr. Burton was likely to be able to understand simple instructions, to ask for assistance, and to be aware of normal hazards. He described as "poor" Mr. Burton's ability to maintain regular attendance and punctuality, to sustain an ordinary routine without special supervision, to complete a normal workday or work week without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to deal with normal work stress. R. 176.

Mr. Burton applied for disability benefits on April 30, 2002. R. 213-15. His claim was denied both initially and upon reconsideration. R. 190, 187. A hearing was held before the ALJ on February 3, 2004. R. 48. The ALJ issued his decision denying benefits on April 21, 2004. R. 13-24. Because the Appeals Council denied further review of the ALJ's decision, R. 4, the ALJ's decision is treated as the final decision of the Commissioner. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Mr. Burton filed a petition for judicial review under 42 U.S.C. § 405(g).

-11-

*The Standard Framework for Determining Disability*

To be eligible for disability insurance benefits, Mr. Burton must establish that he was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d).  This showing would be presumed if Mr. Burton's impairments met or medically equaled any impairment listed in Part 404, Subpart P, Appendix 1 of the implementing regulations, and if the duration requirements were met.  20 C.F.R. § 404.1520(d).  Otherwise, Mr. Burton can establish disability only if his impairments were of such severity that he was unable to perform not only the work he had previously done but also any other kind of substantial work existing in the national economy.  20 C.F.R. § 404.1520(f) and (g).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability.  The steps are:

(1)    Has the claimant engaged in substantial gainful activity?  If so, he was not disabled.

(2)    If not, did the claimant have an impairment or combination of impairments that are severe?  If not, he was not disabled.

(3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)    If not, could the claimant do his past relevant work?  If so, he was not disabled.

(5)    If not, could the claimant perform other work given his residual functional capacity, age, education, and experience? If so, then he was not disabled.  If not, he was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

Applying the five-step process, the ALJ found that Mr. Burton satisfied step one because he had not engaged in any substantial gainful activity since the alleged onset of disability.   At step two, the ALJ found that Mr. Burton's degenerative disc disease was a "severe" impairment under the Act.  The ALJ found that Mr. Burton's other impairments, including diabetes, sleep apnea, and anxiety disorder, were not severe impairments.[1]  At step three, the ALJ found that Mr. Burton failed to demonstrate that his severe impairment met or equaled a listed impairment.  At step four, the ALJ found that Mr. Burton did not retain the

---

[1]The second page of the ALJ's opinion lists "anxiety" as both a severe and non-severe impairment.  R. 17.  In the "Findings" section of his opinion, the ALJ listed anxiety disorder as a non-severe impairment.  R. 23.

residual functional capacity to perform his past relevant work as a home health aid or a loan officer.  At step five, the ALJ found that Mr. Burton was able to perform a significant range of sedentary work and therefore was not disabled.  R. 23-24.

## Standard of Review

If the Commissioner's decision is both supported by substantial evidence and based on the proper legal critera, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Sheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689.  The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion.  *Zurawski*, 245 F.3d at 888.  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  A reversal and remand may

be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions.   *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Accordingly, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review."   *Briscoe*, 425 F.3d at 351.

*Discussion*

I.     *Dr. Bertsch's Report*

Mr. Burton first argues that the ALJ erroneously discounted the opinion of the treating psychiatrist, Dr. Brian Bertsch.   Dr. Bertsch reported that Mr. Burton's anxiety and schizoaffective disorder would likely cause him to miss more than three days of work per month, which the vocational expert testified would render Mr. Burton unable to secure employment.   Though the ALJ did not specifically refer to Dr. Bertsch's diagnosis of schizoaffective disorder, he referred to Dr. Bertsch's assessment and to Mr. Burton's claims of hearing voices.   The ALJ generously stated that Dr. Bertsch had a treating relationship with Mr. Burton after only two assessment appointments.

The ALJ discounted Dr. Bertsch's opinion because of the short length of the relationship and because Dr. Bertsch's assessment appeared to the ALJ to be based on reports from Mr. Burton, whom the ALJ found not entirely credible.   The ALJ relied upon Dr. Berry's assessment, as well as that provided in the

psychological review technique form.  Substantial evidence supports the ALJ's conclusion that Dr. Bertsch's assessment was unreliable as to the severity of Mr. Burton's condition.

A treating source's opinion regarding the nature and severity of a medical condition should be given controlling weight where the opinion is well-supported by medical findings and consistent with other substantial evidence in the case record.  20 C.F.R. § 404.1527(d)(2).  An ALJ may discount a treating source's opinion if it is inconsistent with the opinion of a consulting physician, or if the treating source's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).  A treating physician's determination that a claimant is "unable to work" or "disabled" does not require the ALJ to find disability.  20 C.F.R. § 404.1527(e)(1).

Dr. Bertsch's opinion was inconsistent with other evidence in the record.  As noted by the ALJ, Dr. Berry found no evidence that Mr. Burton experienced delusions or hallucinations.  She described his affect expression as stable, and she noted that his "[t]hought processes evidenced [an] adequate fund of information with no gross discontinuities in [his] stream of thought." R. 272.  Dr. Berry observed that Mr. Burton "was able to perform higher executive functions of abstraction, reasoning, and complex concept formation," was properly oriented

-16-

to time, place, people, and events, and had an intact memory.  *Id.*  Dr. Berry diagnosed Mr. Burton with "Mood Disorder Due to Medical Condition of Diabetic Neuropathy with Generalized Anxiety and Panic Features" and evaluated his GAF at 74.  *Id.*  The ALJ also relied upon the psychiatric review technique form which characterized Mr. Burton's mental impairments as "not severe."  R. 19.  In light of the inconsistency between Dr. Bertsch's opinion and other evidence in the record, the ALJ was not required to give controlling weight to Dr. Bertsch's assessment.

When the treating physician's opinion is not given controlling weight as described above, the ALJ weighs the opinion based on the specialization of the treating source, the length and extent of the treatment relationship, the supportability of the source's opinion, its consistency with the record, and other factors.  20 C.F.R. § 404.1527(d)(2)-(6).  The ALJ noted that the length of the treatment relationship was "quite brief" as Mr. Burton had seen Dr. Bertsch only twice.  R. 19.  He expressed doubt about Dr. Bertsch's assessment where it appeared to be based largely on Mr. Burton's own reports.  See *Farrell v. Sullivan*, 878 F.2d 985, 989-90 (7th Cir. 1989) (affirming ALJ's decision to discount physician's opinion where it was a mere recitation of claimant's complaints, and therefore not objective medical evidence).  The ALJ noted that the evidence demonstrated that Mr. Burton experienced only mild interference with concentration and had not experienced episodes of decompensation or deterioration in work situations, which was consistent with the consultative

psychiatric review technique form.  R. 19, 255-267.  Such reasons are exactly the sort required by the regulations and sufficiently articulate the ALJ's reasoning.

Mr. Burton also argues that the ALJ should have requested additional information pertaining to Dr. Bertsch's report.  Though the ALJ has a "basic obligation to develop a full and fair record" in a Social Security hearing, *Nelson*, 131 F.3d at 1235, the primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant.   See 20 C.F.R. § 404.1512.  The Seventh Circuit has commented more than once "on the difficulty of having a 'complete' record as 'one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on.'" *Luna*, 22 F.3d at 692, quoting *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993).  Courts should therefore respect the Commissioner's "reasoned judgment" regarding how much evidence to gather in a particular case.  *Luna*, 22 F.3d at 692.

Social Security Administration regulations provide that if the evidence in the record is consistent but insufficient, the Commissioner should try to obtain additional evidence.  20 C.F.R. § 404.1527(c)(3).  The regulations also provide that when the evidence received from a treating source is inadequate to permit a decision, the ALJ will obtain the information necessary for the disability determination.   20 C.F.R. § 404.1512(e).   However, where any evidence "is inconsistent with other evidence or is internally inconsistent," the ALJ shall weigh

all of the evidence to determine whether a claimant is disabled.   20 C.F.R. § 404.1527(c).

The ALJ did not find that the evidence was consistent or insufficient.   The ALJ's opinion and the evidence he cited demonstrate that Dr. Bertsch's opinion was inconsistent with the other evidence in the record, including Dr. Berry's assessment and the psychiatric review technique form.   The ALJ offered to consider additional evidence.   He did not express concern that there was not sufficient evidence to determine the severity of Mr. Burton's mental impairments.

The reviewing court does not have the power or duty to "reweigh the evidence or substitute its judgment for that of the ALJ."   *Skarbek*, 390 F.3d at 503.   The ALJ is responsible for weighing the evidence.   The ALJ explained his reasons for discounting Dr. Bertsch's opinion.   His decision to do so comports with the law and is supported by substantial evidence in the record.

II.     *Mr. Burton's Testimony and Credibility*

Mr. Burton also challenges the ALJ's decision to partially discredit his own testimony about the severity of his condition.   The ALJ accepted Mr. Burton's testimony that his symptoms limited his functional capacity, but found him not credible to the extent that he reported that his capacity was so limited that he was completely disabled.  R. 22.  Because hearing officers have the unique opportunity to observe a witness and to evaluate a witness's forthrightness, courts generally

afford such officers' credibility determinations substantial deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  As a result, the general rule is that, absent legal error, an ALJ's credibility finding will not be disturbed unless it is "patently wrong."  *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986); see also *Diaz,* 55 F.3d at 308.

The ALJ offered several reasons for questioning the reliability of Mr. Burton's testimony about the severity of his condition.  Though Mr. Burton claimed in July 2003 that he was experiencing "intense fear," usually chose to stay at home, experienced a markedly diminished interest in all activities, and felt detachment from others, he sustained an injury while bowling in October 2003. R. 18, 55, 159.  The ALJ also noted that physical examination reports described Mr. Burton as alert, oriented, "in no acute distress," and having appropriate affect in October and November 2003.  R. 151, 152, 155.  However, the ALJ noted, Mr. Burton complained of hearing voices during his December 17, 2003 counseling session with Ms. Licht.  R. 18, 158.  The ALJ also noted that Mr. Burton engaged in daily activities, including personal grooming and hygiene practices, caring for his home, watching movies and game shows, and going out for ice cream, and that those activities were not consistent with Mr. Burton's complaints of disabling pain and mental illness.  R. 21.

The ALJ also noted that his credibility finding was based on Mr. Burton's "unpersuasive appearance and demeanor while testifying at the hearing."  R. 22.

While an ALJ is not free to accept or reject a claimant's allegations based solely on such personal observations, these observations should nonetheless be considered in the overall credibility evaluation. SSR 96-7p. The ALJ was careful to point out that this observation was one of many bases for his credibility finding. Because the ALJ's credibility finding is not "patently wrong" and is supported by substantial evidence, it may not be disturbed on judicial review.

III.    *The Logical Bridge*

Mr. Burton also argues that the ALJ failed to build the necessary accurate and logical bridge between the evidence and his findings. See *Clifford*, 227 F.3d at 872. The ALJ may not "ignore an entire line of evidence," *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), but need not provide a written evaluation of every piece of evidence that is presented. *Steward v. Bowen,* 858 F.2d 1295, 1299 (7th Cir. 1988). The ALJ considered the evidence and articulated the reasoning for his findings.

Mr. Burton challenges the ALJ's finding that his peripheral polyneuropathy was not a severe impairment. In support of this argument, Mr. Burton cites the electromyogram report of Dr. Panszi, which provided only a diagnosis of "mild motor sensory peripheral polyneuropathy" but offered no evidence of any functional limitation. R. 346. The ALJ acknowledged Mr. Burton's claim and cited Dr. Mara's report that Mr. Burton exhibited normal motor strength, tone, gait, grip strength, and fine finger skills. R. 17. The ALJ also cited Dr. Mara's

observations that Mr. Burton was slow to rise from a seated position but had no difficulty getting on and off of an examination table.  R. 20.  He cited Dr. Mara's observations that Mr. Burton could stand, walk on heels and toes, tandem walk, and complete a full squat without difficulty.  The ALJ noted that Dr. Mara found no sign of effusion or inflammation of any of Mr. Burton's joints and found no evidence of muscle atrophy or spasm in either his arms or legs.  The ALJ also cited Dr. Mara's finding that Mr. Burton's "sensory system was intact and his deep tendon reflexes were normal and symmetric." *Id.*

The ALJ also cited Dr. Lillo's 2003 reports to support his findings.  He noted Dr. Lillo's observation that Mr. Burton exhibited a decreased range of motion of the cervical spine, as well as minor disc protrusion.  He also noted Dr. Lillo's report that a motor exam showed Mr. Burton exhibited strength of 5/5 in both his arms and legs and that Mr. Burton had a stable gait.  The ALJ also referred to the results of an electrodiagnostic study performed by Dr. Lillo that showed normal results and was "not diagnostic of radiculopathy, neuropathy, or myopathy involving the right or left upper extremity."  R. 20, 126-27.

The ALJ addressed Mr. Burton's complaints of pain.  R. 20.  He noted, however, that medical examinations, including an orthopedic consultation, showed only minor, if any, abnormalities.   The ALJ cited Dr. Heavilon's observations that (1) Mr. Burton could "move fairly easily" from a sitting to standing position "without splinting his back to any major degree"; (2) Mr.

Burton's gait showed that he walked "comfortably"; (3) an examination showed no cutaneous abnormalities of the back; and (4) Mr. Burton had an indentation at the lumbosacral junction consistent with his pars defect and spondylolisthesis that was "not very dramatic."   R. 20.   The ALJ also noted that Dr. Heavilon's musculoskeletal examination demonstrated good motion in Mr. Burton's hips, knees, and ankles.  *Id*; see also R. 117-18.

Mr. Burton also criticizes the ALJ for not mentioning an injury to his shoulder and his knee.  Yet Mr. Burton's testimony indicates that, with the exception of a stiff arm for one day two months prior to the hearing, his shoulder pain had been alleviated.  R. 88.  Further, when the ALJ asked whether Mr. Burton's knee bothered him, Mr. Burton testified that after his knee operation, which had occurred three weeks earlier, he was "doing a lot better with the left knee" and was no longer using anything to help him walk.  R. 56-57.  The ALJ nonetheless limited his residual functional capacity assessment to sedentary work with a sit/stand option and no overhead work with the right arm.  R. 19.

The ALJ also noted that his assessment of Mr. Burton's residual functional capacity was consistent with the testimony of the medical expert, Dr. Hutson, who testified that Mr. Burton should be limited to sedentary work with a sit/stand option, no overhead reaching, avoidance of repeated twisting, no bending beyond 45 degrees, and no trunk vibrations.  R. 20, 90.  Additionally, though the ALJ found Mr. Burton's anxiety not to be severe, he limited his assessment of Mr.

Burton's residual functional capacity to no more than superficial contact with supervisors, other workers, and the general public.  R. 23.

The ALJ is not required to provide an in-depth analysis of every piece of evidence the claimant provides.  *Diaz*, 55 F.3d at 307-08; *Steward*, 858 F.2d at 1299.  The question is whether the ALJ built an adequate and logical bridge between the evidence and the result.  *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).  The evidence demonstrates that the ALJ considered both Mr. Burton's complaints and medical evidence from various physicians.  By considering evidence pertaining to Mr. Burton's pain and assessing Mr. Burton's residual functional capacity in light of such evidence, the ALJ built the necessary logical bridge between the evidence and the findings.

*Conclusion*

The ALJ in this case found that Mr. Burton did not establish disability under the law.  Because the ALJ's decision was consistent with the law and supported by substantial evidence, the court affirms the Commissioner's decision. The court will enter final judgment accordingly.

So ordered.

Date: November 30, 2005

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

-24-

Copies to:

Joseph W. Shull
jshull@pngusa.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov